**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE ACCURAY, INC. SHAREHOLDER
DERIVATIVE LITIGATION

No. 09-05580 CW

ORDER GRANTING
DEFENDANTS'
MOTION TO DISMISS

_____/

Defendants Euan S. Thomson, Wayne Wu, Li Yu, Robert S. Weiss, Elizabeth Dávila, John P. Wareham, Robert E. McNamara, John R. Adler, Jr. and nominal Defendant Accuray Incorporated move to dismiss this shareholder derivative complaint. Derivative Plaintiffs Thomas Beebe, Sanjayh Israni, Eric Bachinski and Christopher Borrelli oppose the motion. The matter was heard on August 12, 2010. Having considered all of the papers filed by the parties and oral argument on the motion, the Court GRANTS Defendants' motion to dismiss and grants leave to amend.

                        BACKGROUND

Plaintiffs are shareholders of nominal Defendant Accuray. Plaintiffs bring this shareholder derivative suit against eight of Accuray's directors. Accuray designs, develops and sells the CyberKnife, an image-guided robotic radiosurgery system designed to treat solid tumors. The CyberKnife is Accuray's sole product.

Defendant Thomson is Accuray's Chief Executive Officer and has

United States District Court
For the Northern District of California

been on the Board of Directors since March, 2002.  Defendant McNamara was Accuray's Senior Vice President and Chief Financial Officer from December, 2004 until his resignation on September 11, 2008.  Defendant Wu is Accuray's Chairman of the Board and has been a Director since April, 1998.  Defendant Yu is the Chairman of the Compensation Committee, a member of the Audit Committee and has been a Director since June, 2004.  Defendant Weiss is the Chairman of the Audit Committee and has been a Director since January, 2007.  Defendant Dávila is the Vice Chairman of the Board, a member of the Audit Committee and Compensation Committee, and has been a Director since February, 2008.  Defendant Wareharm was a Director from February, 2008 until his resignation on January 7, 2010.  Defendant Tu was a Director from May, 2004 to November, 2008.  Defendant Adler was a founder of Accuray and was a Director from December, 1990 to July, 2009.

Plaintiffs allege that Defendants made material misrepresentations about Accuray's revenues and, specifically, about Accuray's backlog.  On February 7, 2007, the day Accuray initiated the initial public offering (IPO), it defined backlog as "deferred revenue and future payments that our customers are contractually committed to make, but which we have not yet received.  Backlog includes contractual commitments from CyberKnife system purchase agreements, service plans and minimum payment requirements associated with our shared ownership programs."

Accuray's registration statement, which accompanied the IPO and was filed with the SEC, included several disclosures detailing the risk related to the business.  For instance, Accuray stated:

2

United States District Court
For the Northern District of California

> Because of the high unit price of the CyberKnife system, and
> the relatively small number of units installed each quarter,
> each installation of a CyberKnife system can represent a
> significant component of our revenue for a particular
> quarter.  Therefore, if we do not install a CyberKnife
> system when anticipated, our operating results may vary
> significantly and our stock price may be materially harmed.
>
> . . .
>
> Events beyond our control may delay installation and the
> satisfaction of contingencies required to receive cash
> inflows and recognize revenue, such as . . . customer
> funding or financing delay . . . .  Therefore, delays in the
> installation of CyberKnife systems or customer cancellations
> would adversely affect our cash flows and revenue, which
> would harm our results or operations and could cause our
> stock price to decline.
>
> . . .
>
> If third-party payors do not continue to provide sufficient
> coverage and reimbursement to healthcare providers for use
> of the CyberKnife system, our revenue would be adversely
> affected.

Request for Judicial Notice (RJN),[1] Ex. A at 12-13 (Comp., Ex. 1 at

12-13).  Accuray further noted that it "may be unable to convert

all of this backlog into recognized revenue due to factors outside

our control."  Id. at 44 (Id. at 44).  These disclosures were

included in Accuray's quarterly and annual filings throughout the

time period during which Plaintiffs allege Defendants' wrongdoing.

In a May 1, 2007 press release, Accuray announced that as of

March 31, 2007, it had changed its definition of backlog.  The new

definition included "signed non-contingent contracts as well as

backlog under signed contingent contracts that the Company believes

have a substantially high probability of being booked as revenue."

─────────────────────

[1]The Court takes judicial notice of the documents filed with
the SEC.  See Dreiling v. American Exp. Co., 458 F.3d 942, 946 (9th
Cir. 2006).

3

United States District Court
For the Northern District of California

Comp. ¶ 69 (Comp. ¶ 61).  Accuray stated, "Contingencies under customer contracts included in backlog include customer acceptance of the Company's legal terms and conditions of sale, hospital board approvals, customer establishment of necessary financing or legal entities and, in U.S. states, governmental approval of a certificate of need (CON) for the operation of a radiosurgery system."  Id. (Comp., Ex. 5).

Also on May 1, 2007, Thomson and McNamara held an earnings conference call to discuss the third fiscal quarter of 2007.  In that call, Thomson stated, "On balance, we feel confident that 90% of the total backlog reported will be converted to revenue."  Id. ¶ 80 (Comp., Ex. 6 at 5).  He also noted that the "total backlog reported this quarter, taken in conjunction with reported revenue, is a good and reliable indicator that [sic] the new business generated during a given quarter."  Id. (Comp., Ex. 6 at 5). McNamara also expressed "confidence that at least 90% of the quoted backlog will convert to revenue."  Id. ¶ 81. (Comp., Ex. 6 at 8). He also stated, "We believe that our current definition of backlog is a more meaningful metric for Accuray as an indicator of future revenue."  Id. (Comp., Ex. 6 at 8).  He also noted, "On a quarterly basis, the company will review each contingent contract to determine whether progress towards satisfaction of contingencies is sufficient to support inclusion of the contract within the backlog."  Id. (Comp., Ex. 6 at 8).  Accuray announced increased revenues and backlogs throughout the rest of fiscal year 2007.

Plaintiffs allege that these statements were false when made because the revised backlog definition was not a better metric than

4

the previous backlog definition and that Defendants knew that they would not realize 90% of the new backlog definition. Plaintiffs specifically claim that the backlog included risky contingent contracts that did not have a substantial likelihood of resulting in future revenue and orders that had little chance of becoming finalized CyberKnife installations. Plaintiffs also allege that cancelled orders were not timely removed from the backlog figures.

On August 30, 2007, Directors Thomson, Wu, Yu, Weiss, Tu and Adler authorized the repurchase of $25 million of Accuray shares. Over the course of the next year, Accuray repurchased $23.9 million of its own stock. Plaintiffs claim that these Defendants, as well as Dávila and Wareham, who were later appointed to the Board, consciously disregarded their fiduciary duties when they allowed this stock to be repurchased. Plaintiffs allege that the stock was trading at an artificially inflated price due to the false and misleading statements made by Defendants.

On January 30, 2008, Accuray announced its second quarter 2008 earnings in a press release. Comp. ¶ 105. (Comp., Ex. 26). It reported total revenue of $54 million, which was a 98% increase over second quarter 2007 earnings. Id. It also claimed that its backlog had increased to approximately $660 million. Id. (Comp., Ex. 26). However, Accuray adjusted its "revenue guidance for fiscal 2008" from $250-270 million to $210-230 million. Id. (Comp., Ex. 26). Accuray claimed that this adjustment was due to "current economic conditions, specifically, the tightening of credit markets in the United States." It stated, "While this was a positive quarter with respect to revenue and backlog growth, we

believe that broader credit market issues are having a short-term impact on some of our U.S. customers' purchase and installation timelines, as obtaining financing has become more difficult." <u>Id.</u> (Comp., Ex. 26).  In a conference call on the same day, Thomson stated that Accuray removed "a number of contracts from backlog in order to give our investors greater visibility into the potential effect of this market adjustment." <u>Id.</u> ¶ 106.  (Comp., Ex. 27 at 4-5).  Thomson also stated that the group of customers who were experiencing credit issues were the same group who might be negatively impacted by a rule change in the way Medicare would reimburse providers for procedures conducted with the CyberKnife. The next day, Accuray's stock fell 36% percent.

On April 29, 2008, Accuray reported total revenue of $58.5 million for the third quarter of fiscal year 2008, which was a 57% increase over third quarter of fiscal year 2007.  Accuray experienced its fifth consecutive quarter of record revenue. However, Accuray also reduced its backlog by $58 million, from $660 million to $602 million.  It claimed that this decrease was "a net result of cancellations of existing contracts of $54 million, combined with unfavorable contract movement out of backlog based on our specific assessment.  All of these cancellations were associated with contingent contracts . . . ." <u>Id.</u> ¶ 111.  (Comp., Ex. 33 at 8).  On April 29, 2008, Accuray's stock dropped from $8.06 per share to $7.83 per share, but on May 1, 2008, it increased to $8.56 per share and by May 5, it was well above $9.00 per share.

On August 19, 2008, Accuray issued its fourth quarter fiscal

2008 press release, which stated its total revenue as $50.9 million, a 16% increase over fourth quarter fiscal 2007. Accuray also announced a backlog of $647 million. It claimed that new orders contributed $68 million directly to its non-contingent backlog. However, Accuray also removed $39 million from backlog because either eight CyberKnife orders were cancelled or their future revenue recognition was in question. Id. ¶ 114. (Comp. ¶ 120). On August 20, 2008, Accuray shares began trading at $7.57 per share, at one point dropped to a low of $6.90 per share, but closed at $7.70 per share.

On September 11, 2008, McNamara and Christopher Mitchell resigned from Accuray. Mitchell was Accuray's General Counsel.

In November, 2009, the first of several derivative actions was filed in this Court. In March, 2010, the cases were consolidated and an amended complaint was filed in April, 2010. In the controlling complaint, Plaintiffs assert twelve causes of action for alleged breaches of fiduciary duties, waste, unjust enrichment, insider selling and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

DISCUSSION

I. Standing

Federal Rule of Civil Procedure 23.1(b)(1) requires a derivative plaintiff to plead that he "was a shareholder . . . at the time of the transaction complained of . . . ." Rule "23.1 requires that a derivative plaintiff be a shareholder at the time of the alleged wrongful acts and that the plaintiff retain ownership of the stock for the duration of the lawsuit." Lewis v.

Chiles, 719 F.2d 1044, 1047 (9th Cir. 1983).   A derivative
plaintiff has no standing to challenge transactions that occurred
prior to the time that plaintiff owned company stock.   In re
VeriSign, Inc., Deriv. Litig., 531 F. Supp. 2d 1173, 1202 (N.D.
Cal. 2007) ("plaintiffs must unambiguously indicate in any amended
complaint the dates they purchased Verisign stock, and whether they
have continuously owned VeriSign stock from the time of purchase up
to the present.").

Plaintiffs generally allege that they were shareholders of
"Accuray at the time of the continuing wrongs complained of
herein."  Comp. ¶ 26-29.  This vague allegation does not satisfy
the strict standard of Rule 23.1.  Plaintiffs do not identify when
they purchased Accuray shares.  Plaintiffs attempt to remedy their
complaint by attaching declarations to their opposition which state
the date each Plaintiff purchased Accuray stock.  However, on a
motion to dismiss, the Court reviews the adequacy of Plaintiffs'
claims asserted in the complaint, not the claims they assert in
their brief.  Schneider v. Cal. Dept. of Corrections, 151 F.3d
1194, 1197 n. 1 (9th Cir. 1998) ("In determining the propriety of a
Rule 12(b)(6) dismissal, a court may not look beyond the complaint
to a plaintiff's moving papers, such as a memorandum in opposition
to a defendant's motion to dismiss.") (emphasis in original).

Even if the Court were to consider these declarations, they
would not support the allegation that all Plaintiffs continuously
owned shares of Accuray throughout the entire period of Defendants'
alleged wrongdoing, February, 2007 to January, 2009.  The
declarations show that Christopher Borrelli has owned shares since

8

August 9, 2007; Thomas Beebe has owned shares since August 17, 2007; and Eric Bachinski has owned shares since January 31, 2008.[2] Because Plaintiffs fail to satisfy this aspect of Rule 23.1, the Court concludes that Plaintiffs do not have standing to pursue shareholder derivative claims.

II.  Demand Futility

Under the substantive law of Delaware,[3] "the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation." Rales v. Blasband, 634 A.2d 927, 932 (Del. 1993).

When challenging the propriety of decisions made by directors, the shareholder must overcome the powerful presumption of the business judgment rule. Id. at 933.  The shareholder must show that, "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984).  The only claims in Plaintiffs' complaint that address an affirmative Board decision

---

[2]Sanjay Israni is arguably the only Plaintiff to declare that he has owned shares throughout the entire period of Defendants' alleged wrongdoing, as he states that he has owned shares since February 7, 2007.

[3]  The substantive law of Delaware applies because Accuray is a Delaware corporation.  In re Silicon Graphics, 183 F.3d 970, 990 (9th Cir. 1999).

United States District Court
For the Northern District of California

9

relate to the authorization of a $25 million share repurchase.

When a shareholder plaintiff challenges something other than a board decision, "the business judgment rule has no application" and the test for demand futility is simply whether the plaintiff has plead particularized facts that "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." <u>Rales</u>, 634 A.2d at 933-34. Under federal procedural law, the facts necessary to demonstrate that demand would be futile must be plead with particularity. Fed. R. Civ. P. 23.1; <u>In re Silicon Graphics</u>, 183 F.3d at 989.

Prior to filing this lawsuit, Plaintiffs did not present their allegations to the Accuray Board of Directors and demand that Accuray pursue this litigation on its own behalf. Instead, Plaintiffs allege that it would have been futile to make such a demand because a reasonable doubt has been raised as to individual Defendants' disinterest and independence.

At the time the complaint was filed, Accuray's Board of Directors consisted of seven individuals: Euan Thomson, Louis Lavigne, Jr., Dennis Winger, Elizabeth Dávila, Wayne Wu, Li Yu and Robert Weiss. All of the Board members were outside directors except Thomson. Plaintiffs must plead particularized facts showing that four directors (a majority) were not sufficiently disinterested and independent to have considered a pre-suit demand. Plaintiffs do not allege that demand is futile with respect to Lavigne or Winger. However, Defendants do not argue that Thomson is not disinterested and independent. In a footnote, they state,

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

"Because all of the outside directors are clearly disinterested and independent, this Motion does not address Dr. Thomson, the sole inside director, in the demand analysis."   Motion at 7 n.5.

Defendants move to dismiss the complaint on the basis that it does not sufficiently allege that Plaintiffs either demanded that Accuray proceed with these claims before filing suit on its behalf or that such a demand would have been futile.   As described below, the Court concludes that Plaintiffs have not alleged particularized facts showing that there is a reasonable doubt that a majority of the board is disinterested or independent.

A.   Disinterest

To plead a disqualifying interest, Plaintiffs must allege that a director "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders," or that "a corporate decision will have a materially detrimental impact on a director, but not the corporation and the stockholders."   Id. at 936.

Plaintiffs first argue that the directors are "interested" because they face a likelihood of personal liability for breaches of fiduciary duty and violations of the securities laws based on their misstatements regarding the backlog and they caused Accuray to disseminate false and misleading information.   For allegations of personal liability to create an interest which would make a demand futile, Plaintiffs must set forth facts establishing that personal liability is not "a mere threat" but instead that the director's actions were "so egregious that a substantial likelihood of director liability exists."   In re Silicon Graphics, Inc. Sec.

11

Litiq., 183 F.3d 970, 990 (9th Cir. 1999) (quoting Aronson, 473 A.3d at 805); see Rales, 634 A.2d at 936.  Plaintiffs must include particularized factual allegations "detailing the precise roles that these directors played at the company, the information that would have come to their attention in these roles, and any indication as to why they would have perceived the [wrongdoing]." Guttman v. Huang, 823 A.2d 492, 502 (Del. Ch. 2003).

Section 102(b)(7) of the Delaware General Corporation Law authorizes Delaware corporations, by a provision in the certificate of incorporation, to exculpate their directors from monetary damage liability for a breach of the duty of care, but not "[f]or any breach of the director's duty of loyalty" or "for acts or omissions not in good faith . . . ."  Del. Code Ann. tit. 8, § 102(b)(7). The exculpatory clause limits directors' liability to actions that are made in bad faith or constitute intentional misconduct. Guttman, 823 A.2d at 501.  Accuray's certificate of incorporation contains such an exculpatory provision.  Therefore, Plaintiffs must a plead a non-exculpated claim based on particularized facts. Guttman, 823 A.2d at 501.

Plaintiffs challenge the applicability of the exculpatory clause.  However, even if the exculpatory clause is not considered, Plaintiffs' generalized allegations are insufficient to demonstrate that Director Defendants face a substantial likelihood of personal liability.  Plaintiffs' substantive claims will be addressed in more detail below.  Before addressing the substantive claims, however, the Court considers Plaintiffs' other allegations of demand futility.

12

**United States District Court**
For the Northern District of California

1           1.    SEC Filings and Other Public Statements

2         Plaintiffs allege that Director Defendants Wu, Weiss, Yu and

3 Dávila face a substantial likelihood of liability because they

4 either "approved and signed the Company's Forms 10-K" or "signed

5 Accuray's Registration Statement," both of which are alleged to be

6 false or misleading.  However, "execution of . . . financial

7 reports, without more, is insufficient to create an inference that

8 the directors had actual or constructive notice of any illegality."

9 Wood v. Baum, 953 A.2d 136, 142 (Del. 2008).  Plaintiffs argue

10 that, because the information about the misconduct in question

11 pertains to a company's core business, courts impute knowledge of

12 that information to each board member.  However, in derivative

13 actions, courts "have repeatedly held that a plaintiff must allege

14 more than that Directors should have known or must have known about

15 matters relating to the corporation's 'core business.'" Jones ex

16 rel. CSK Auto Corp. v. Jenkins, 503 F. Supp. 2d 1325, 1337 (D.

17 Ariz. 2007) (citation omitted).  Plaintiffs rely on Pfiefer v.

18 Toll, 989 A.2d 683, 692 (Del. Ch. 2010).  In Pfiefer, the court

19 held that it was reasonable to infer that outside directors had

20 knowledge of false earnings projections because the projections

21 contradicted other statements made by the company and the company's

22 own internal metrics.  The court also noted that the remarkably

23 high earnings projections were not only related to the "core

24 operations" of the company, but also discussed on earnings calls,

25 during media appearances and in interviews.

26         Here, Plaintiffs fail to allege that the alleged inaccurate

27 recording of the backlog was discussed by the Board.  Further, the

28

fact that the backlog and revenues were discussed at board meetings and touted in press releases and conference calls cannot imply that any Accuray directors knew of the alleged accounting problems. Moreover, there are no allegations that internal company metrics or information discussed at the Board level contradicted any of Defendants' statements.

2.    Reliable Financial Controls

Plaintiffs allege that Defendants' failure to ensure reliable systems of financial controls, along with their other allegations, establish demand futility.  Such a "failure to monitor" claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959, 967 (Del. Ch. 1996).  Demand is not excused where plaintiffs fail to plead facts showing either that "the directors utterly failed to implement" any controls or "having implemented such . . . controls, consciously failed to monitor or oversee [their] operation . . . ."  Stone v. Ruter, 911 A.2d 362, 370 (Del. 2006).  Plaintiffs have not alleged any specific information that each director knew and ignored concerning the backlog.  Moreover, Defendants did undertake efforts to improve internal controls and Plaintiffs acknowledge this in their complaint.

3.    Audit Committee Membership

Plaintiffs allege that, as "members of the Audit Committee," Defendants Wu, Yu, Weiss and Dávila "were responsible for overseeing and directly participating in" the allegedly false press releases, conference calls and filings.  Comp. ¶ 105.  However,

14

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Plaintiffs have not alleged particularized facts to support this allegation.

> Pleading that the director defendants . . . "caused or allowed" the Company to issue certain statements is not sufficient particularized pleading to excuse demand under Rule 23.1. It is unclear from such allegations how the board was actually involved in creating or approving the statements, factual details that are crucial to determining whether demand . . . would have been excused as futile.

In re Citigroup Inc. Shareholder Deriv. Litig., 964 A.2d 106, 133 n.88 (Del. Ch. 2009). According to Accuray's Audit Committee Charter, "the Committee's responsibilities are limited to oversight" and it "is not the responsibility of the Committee . . . to determine that the Company's financial statements and disclosures are complete and accurate . . . ." Walters Decl., Ex. D, Appdx. A, § I. The Charter requires the Audit Committee to "review[] and discuss[] information presented in the Company's earnings press releases and other information provided to analysts and rating agencies." Id. § IV.8. The Charter also notes that such discussions "may be general in nature" and "need not take place in advance of each earnings release or each instance in which the Company provides earnings guidance." Id. However, it is important to note that "liability is not measured by the aspirational standards established by the internal documents detailing a company's oversight system." In re Citigroup, 964 A.2d at 135. Even putting aside the text of the Audit Committee's Charter, Plaintiffs fail to allege any particularized facts concerning the Audit Committee's role in the decision to change the definition of backlog or that the Committee knew of inaccuracies in the challenged statements. Guttman, 823 A.2d at 498 ("The

15

United States District Court
For the Northern District of California

complaint is entirely devoid of particularized allegations of fact demonstrating that the outside directors had actual or constructive notice of the accounting improprieties.").

4.    Compensation Committee Membership

Plaintiffs allege that Defendants Wu, Yu and Weiss committed "corporate waste" because they approved compensation plans for Thomson and Hampton that based 14% and 6.5%, respectively, of fiscal year 2008 compensation on backlog.  Comp. ¶¶ 94, 152. Plaintiffs argue that tying compensation to backlog was wasteful because the committee knew that the "reported backlog numbers were grossly inaccurate."  Opp. at 19.  Plaintiffs also argue that the Compensation Committee improperly provided McNamara with a severance package valued at $934,464 knowing that he breached his fiduciary duties to Accuray and its shareholders.

To establish waste, Plaintiffs must allege that "what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid."  Grobow v. Perot, 539 A.2d 180, 189 (Del. 1988).  "[D]irectors have the power, authority and wide discretion to make decisions on executive compensation."  Brehm v. Eisner, 746 A.2d 244, 262 n.56 (Del. 2000); See Del. Code Ann. tit 8, § 122(5).

Plaintiffs have not adequately alleged that the Compensation Committee committed waste.  Plaintiffs fail to show that relying on the backlog component increased compensation or was wasteful in any way.  In fact, reliance on backlog actually decreased compensation for Thomson and Hampton because once the Committee realized that

16

United States District Court
For the Northern District of California

Accuray was not going to meet a particular goal of backlog for fiscal year 2008, it decreased these executives' compensation to only 40% of the target payment.

As to the severance package, Plaintiffs ignore the fact that the amount was dictated by McNamara's publicly filed employment agreement. "A corporate board's decision to honor the corporation's contractual obligations certainly is not a business decision so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interest." In re Am. Int'l. Group, Inc. Deriv. Litig., 2010 WL 1245000, at *18 (S.D.N.Y.).

> 5.    Repurchase of Shares

Plaintiffs argue that the Board authorized the $25 million repurchase of Accuray shares at artificially inflated prices to mask Accuray's declining revenues. They claim that, ultimately, the repurchase of stock led to a waste of millions of dollars. Plaintiffs argue that there is reasonable doubt that the decision to repurchase shares "was otherwise the product of a valid exercise of business judgment." Aronson, 473 A.2d at 814. The decision to repurchase stock was made, in part, by Defendants Wu, Weiss and Yu.

Plaintiffs face "a substantial burden, as the second prong of the Aronson test is directed to extreme cases in which despite the appearance of independence and disinterest a decision is so extreme or curious as to itself raise a legitimate ground to justify further inquiry and judicial review." Highland Legacy Ltd. v. Singeru, 2006 WL 741939, at *7 (Del. Ch.) (internal citation and quotation marks omitted). Plaintiffs have not alleged

17

**United States District Court**
For the Northern District of California

particularized facts to suggest that Defendants had any knowledge that the stock price was artificially inflated at the time of the repurchase authorization or that the repurchase was a waste of Accuray's money.  In the absence of such facts, the Court must presume that the Board had a legitimate business purpose.  <u>In re Silicon Graphics</u>, 183 F.3d at 990 (holding that plaintiff "has not stated facts that demonstrate that the Board intended for the stock repurchase plan to inflate artificially the value of SGI stock in order to facilitate insider trading.  In the absence of such facts, we must presume that the Board had a legitimate business purpose when it repurchased SGI stock.").

B.   Independence

To plead a lack of independence, Plaintiffs must "show that the directors are beholden to the [other directors] or so under their influence that their discretion would be sterilized." <u>Rales</u>, 634 A.2d at 936 (internal quotation marks omitted).  Plaintiffs allege that certain "long term relationships" rendered three of the outside directors dependent.  Plaintiffs claim that Yu and Wu are dependent on each other because of their prior employment with Preferred Bank and that Dávila is dependent on Adler due to their affiliations with Stanford University.  Both of these arguments fail because Plaintiffs have not shown that these Director Defendants were dominated or controlled by these relationships. <u>Grobow</u>, 539 A.2d at 189.  Yu and Wu's working relationship at Preferred Bank is not problematic because allegations of "a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." <u>Beam v.</u>

United States District Court
For the Northern District of California

<u>Stewart</u>, 845 A.2d 1040, 1050 (Del. 2004).  For the same reason, the claim that Dávila lacked independence because she and Adler were both affiliated with Stanford University also fails.  Plaintiffs do not even allege that Dávila and Adler knew each other at Stanford. That they were both on the same campus at the same time is not enough to overcome the presumption of a director's independence. Lastly, Plaintiffs have not alleged that these relationships constitute a disinterested Director's dependence on an interested one.

In sum, when viewing the totality of Plaintiffs allegations, they have not plead demand futility with sufficient particularity. Therefore, the Court grants Defendants' motion to dismiss and grants leave to amend.  Because Plaintiffs may amend their complaint, the Court addresses whether any of Plaintiffs' substantive claims present valid legal theories.

III. Federal Law Claims

    A.   Violations of Section 10(b) of the Exchange Act (Counts One and Two)

In Counts one and two of the complaint, Plaintiffs allege that Defendants Thomson and McNamara violated Section 10(b) of the Exchange Act.

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b); <u>see also</u> 17 C.F.R. § 240.10b-5 (Rule 10b-5).  To state a claim under § 10(b), a

plaintiff must allege: "(1) a misrepresentation or omission of material fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." In re Gilead Sciences Securities Litig., 536 F.3d 1049, 1055 (9th Cir. 2008).

Defendants argue that Plaintiffs have not adequately plead scienter. Some forms of recklessness are sufficient to satisfy the element of scienter in a § 10(b) action. See Nelson v. Serwold, 576 F.2d 1332, 1337 (9th Cir. 1978). Within the context of § 10(b) claims, the Ninth Circuit defines "recklessness" as

> a highly unreasonable omission [or misrepresentation], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)). As explained by the Ninth Circuit in Silicon Graphics, recklessness, as defined by Hollinger, is a form of intentional conduct, not merely an extreme form of negligence. See Silicon Graphics, 183 F.3d at 976-77. Thus, although § 10(b) claims can be based on reckless conduct, the recklessness must "reflect[] some degree of intentional or conscious misconduct." See id. at 977. The Silicon Graphics court refers to this subspecies of recklessness as "deliberate recklessness." See id. at 977.

Pursuant to the requirements of the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference

20

that the defendant acted with the required state of mind."  15

U.S.C. § 78u-4(b)(2).  The PSLRA thus requires that a plaintiff

plead with particularity "facts giving rise to a strong inference

that the defendant acted with," at a minimum, deliberate

recklessness.  <u>See</u> 15 U.S.C. § 78u-4(b)(2); <u>Silicon Graphics</u>, 183

F.3d at 977.  Facts that establish a motive and opportunity, or

circumstantial evidence of "simple recklessness," are not

sufficient to create a strong inference of deliberate recklessness.

<u>See</u> <u>Silicon Graphics</u>, 183 F.3d at 979.  To satisfy the heightened

pleading requirement of the PSLRA for scienter, plaintiffs "must

state specific facts indicating no less than a degree of

recklessness that strongly suggests actual intent."  <u>Id.</u>

When evaluating the strength of an inference, "the court's job

is not to scrutinize each allegation in isolation but to assess all

the allegations holistically."  <u>Tellabs, Inc. v. Makor Issues &</u>

<u>Rights, Ltd.</u>, 551 U.S. 308, 325 (2007).  "The inference of scienter

must be more than merely 'reasonable' or 'permissible' -- it must

be cogent and compelling, thus strong in light of other

explanations."  <u>Id.</u> at 324.  A complaint will survive "only if a

reasonable person would deem the inference of scienter cogent and

at least as compelling as any opposing inference one could draw

from the facts alleged."  <u>Id.</u>  However, "the inference that the

defendant acted with scienter need not be irrefutable, <u>i.e.</u>, of the

'smoking-gun' genre, or even the 'most plausible of competing

inferences.'"  <u>Id.</u>

Plaintiffs have not plead particularized facts that either

Thomson or McNamara was aware of, or actively concealed, allegedly

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

inflated sales or backlog figures.  Plaintiffs rely on the speculation of four confidential witnesses: a Regional Sales Director from 2004 to 2007; a Regional Sales Director from 2005 to 2007; a Sales Operations Specialist from 2006 to 2009; and a database analyst during 2008.  However, the allegations based on the knowledge and opinions of these CWs do not add anything meaningful to the complaint because they do not purport to have had any contact with Thomson or McNamara; therefore, they have no knowledge of what either Defendant knew at the time each of the challenged statements was made.  Although the CWs challenge the accuracy of certain comments made by Thomson and McNamara, the CWs' opinion as to the accuracy of these comments are not a substitute for evidence of Defendants' scienter.

Plaintiffs also claim that McNamara's resignation is evidence of scienter.  However, there is nothing suspicious about the timing of his resignation, even though it occurred weeks after Accuray's August, 2008 backlog revision.  See Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1002 (9th Cir. 2009) ("Where a resignation occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of restatement's issuance itself.").

Plaintiffs contend that, because Thomson and McNamara "repeatedly touted the Company's record backlog and promoted market reliance on the Revised Backlog Definition as a window into revenues," there is a strong inference that they knew or were deliberately reckless in not knowing that they acted illegally by

not accurately reporting the backlog to the public and the SEC.   In essence, Plaintiffs argue that understanding how the backlog was configured was critical to Accuray's "core operations."   <u>South Ferry LP v. Killinger</u>, 542 F.3d 776, 785 (9th Cir. 2008) ("Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard. . . However, in some unusual circumstances, the core operations inference, without more, may raise the strong inference required by the PSLRA"). Here, while Defendants no doubt knew how important the backlog was to investors, not enough facts have been alleged to support a strong inference that, simply because of the importance of the backlog and Defendants' position in the company, they knew, or were deliberately reckless in not knowing, that accounting errors were made.

Plaintiffs also allege that Thomson's bonus compensation and stock sale provided a motive to inflate backlog.   However, the fact that Thomson's bonus compensation was tied to the backlog does not necessarily raise a strong inference of scienter, especially because the amount that was tied to the backlog accounted for only 20% of a potential bonus.

As to Thomson's lone stock sale, he sold only 10.5% of his stock and he did so during the IPO.   Insider stock sales become suspicious "only when the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."   <u>In re</u>

23

United States District Court
For the Northern District of California

Vantive Corporation Securities Litig., 283 F.3d 1079, 1092 (9th Cir. 2002).  "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history."  Silicon Graphics, 183 F.3d at 986.  Thomson's relatively small sale during a time when shareholders traditionally trade stock is not suspicious behavior.

In sum, the Court concludes that Plaintiffs' allegations do not support a strong inference of scienter.  Therefore, Plaintiffs' Section 10(b) claims against Thomson and McNamara are dismissed.

B.   Section 20(a) (Counts Three and Four)

Counts three and four of the complaint allege control person liability against Defendants Wu, Yu, Weiss, Dávila and Wareham based on Section 20(a) of the Exchange Act, which states,

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

17 U.S.C. § 78t(a).

To prove a prima facie case under Section 20(a), a plaintiff must prove: (1) "a primary violation of federal securities law" and (2) "that the defendant exercised actual power or control over the primary violator."  Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000).  "[I]n order to make out a prima facie case, it is not necessary to show actual participation or the exercise of power; however, a defendant is entitled to a good faith defense if

24

**United States District Court**
For the Northern District of California

he can show no scienter and an effective lack of participation."
Id. "Whether [the defendant] is a controlling person is an
intensely factual question, involving scrutiny of the defendant's
participation in the day-to-day affairs of the corporation and the
defendant's power to control corporate actions." Id.

Plaintiffs allege that, by virtue of Defendants' high-level
positions in Accuray, they influenced and controlled the content
and dissemination of the myriad statements that Plaintiffs contend
were false and misleading. Because Plaintiffs failed to plead a
primary securities violation, Plaintiffs have also failed to plead
a violation of Section 20(a). Moreover, Plaintiffs failed to plead
that these Defendants' "participation in the day-to-day affairs" of
Accuray was such that they "exercised actual power or control over"
other individuals who were involved in the issuance of any
accounting decisions or financial statements.

IV. State Law Claims

Seven out of Plaintiffs' eight state law claims sound in fraud
and thus are subject to the heightened pleading requirements of
Federal Rule of Civil Procedure 9(b). The only claim not subject
to Rule 9(b) is Plaintiffs' unjust enrichment claim. The
allegations for the other seven state causes of action must be
"specific enough to give defendants notice of the particular
misconduct which is alleged to constitute the fraud charged so that
they can defend against the charge and not just deny that they have
done anything wrong." Semegen v. Weidner, 780 F.2d 727, 731 (9th
Cir. 1985). Statements of the time, place and nature of the
alleged fraudulent activities are sufficient, id. at 735, provided

United States District Court
For the Northern District of California

the plaintiff sets forth "what is false or misleading about a statement, and why it is false."  In re GlenFed, Inc., Secs. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994).  Scienter may be averred generally, simply by saying that it existed.  Id. at 1547; see Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally.").  Allegations of fraud based on information and belief usually do not satisfy the particularity requirements of Rule 9(b); however, as to matters peculiarly within the opposing party's knowledge, allegations based on information and belief may satisfy Rule 9(b) if they also state the facts upon which the belief is founded.  Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1439 (9th Cir. 1987).

A.   Breach of Fiduciary Duty Regarding Dissemination of Alleged False and Misleading Statements (Counts Six and Seven)

Fiduciaries owe Accuray and its shareholders the duties of due care, loyalty and good faith.  Emerald Partners v. Berlin, 787 A.2d 85, 90 (Del. 2001).  Plaintiffs claim that the Audit Committee Defendants -- Tu, Wu and Weiss -- breached their fiduciary duties by disseminating false and misleading financial statements in Accuray's Registration Statement and Forms 10-K filed with the SEC.  However, Plaintiffs do not allege that any member of the Audit Committee prepared these financial statements or that they were directly responsible for the misstatements.  Further, even if these Defendants were involved in preparing the statements, Plaintiffs have not alleged that they were made with knowledge of alleged inaccuracies or in bad faith.

United States District Court

For the Northern District of California

1    Plaintiffs' breach of fiduciary duty claims against Defendants

2    Thomson and McNamara are predicated on the same alleged

3    misrepresentations as the Section 10(b) claims and therefore they

4    suffer from the same lack of specificity.  Although Plaintiffs need

5    only prove gross negligence to establish a breach of fiduciary

6    claim in this context, the standard for gross negligence is

7    "stringent" and not readily satisfied.  In re Lear Corp. S'holder

8    Litig., 967 A.2d 640, 652 (Del. Ch. 2008).  Gross negligence is "a

9    reckless indifference to or a deliberate disregard of the whole

10   body of stockholders' or actions which are without the bounds of

11   reason."  In re Walt Disney Co. Deriv. Litig., 907 A.2d 693, 750

12   (Del. Ch. 2005) (internal citations and quotation marks omitted).

13   Plaintiffs have not alleged that Thomson and McNamara deliberately

14   disregarded or were recklessly indifferent to alleged inaccuracies

15   in their statements about the backlog at the time they made those

16   statements.

17   Therefore, the Court grants Defendants' motion to dismiss

18   these misrepresentation claims.

19   B.   Repurchase Claims (Counts Five and Eight)

20   Plaintiffs allege that "Director Defendants" breached their

21   fiduciary duties by "authorizing Accuray's stock repurchase plan

22   and failing to halt the Company's purchase under the stock

23   repurchase plan while Accuray's share price was artificially

24   inflated . . . ."  Comp. ¶ 205.  Plaintiffs have not shown that

25   "the directors acted in bad faith when they approved the stock

26   repurchases."  In re Citigroup, Inc. S'holder Deriv. Litig., 2009

27   WL 2610746, at *9 (S.D.N.Y.).  Here, at most, Plaintiffs'

27

United States District Court
For the Northern District of California

allegations show that the stock repurchases were "bad business decisions in light of the subsequent decline in the price" of Accuray's stock.  Id.  Thus, Plaintiffs' claim against the Director Defendants fails.

Plaintiffs similarly allege that Thomson and McNamara breached their fiduciary duty because they "caused" Accuray to purchase its own stock while the share price was artificially inflated. However, as noted above, Plaintiffs have not alleged that Thomson, as a Board member, made the decision to authorize the share repurchase in bad faith.  The claim against McNamara is equally unavailing because he was not a member of the Board and there are no allegations to suggest that he was involved in the decisions to repurchase shares.  Therefore, Plaintiffs' claim against Thomson and McNamara also fail.

C.   Waste Claim (Count Nine)

Plaintiffs allege that Defendants wasted corporate assets in several ways: (1) directing Accuray to purchase over $23.9 million of its own stock at artificially inflated prices; (2) paying bonuses and compensation to certain of its executive officers; (3) paying McNamara a lucrative severance package; and (4) incurring potentially hundreds of millions of dollars of legal liability and legal costs.

All but the last allegation were addressed in the above demand futility analysis.  To summarize from that analysis, Plaintiffs fail (1) to rebut the presumption that the repurchases were a valid exercise of business judgment; (2) to allege that the bonuses and compensation packages were devoid of a legitimate corporate

purpose; and (3) to allege that McNamara's severance package was an unconscionable waste of corporate assets.  Plaintiffs' legal liability and costs allegation is too vague and speculative to satisfy the requirements of a waste claim.  Plaintiffs have not satisfied the rigorous test for waste.

D.    Unjust Enrichment (Count Ten)

To state a claim for unjust enrichment, Plaintiffs must allege (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law.  See Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377, 393 (Del. Ch. 1999).  Plaintiffs alleged that Defendants "were unjustly enriched as a result of the compensation and director renumeration they received while breaching fiduciary duties owed to Accuray."  Comp. ¶ 215.  However, Plaintiffs fail to allege how each Defendant was unjustly enriched at the expense of Accuray.  See Fleer Corp. v. Topps Chewing Gum, Inc., 539 A.2d 1060, 1062 (Del. 1988) ("Before the court may properly order restitution, it must find that the defendant was unjustly enriched at the expense of the plaintiff.").  Therefore, the Court grants, with leave to amend, Defendants' motion to dismiss the unjust enrichment claim.

E.    Insider Trading (Counts Eleven and Twelve)

Plaintiffs allege that Defendants violated California and Delaware law proscribing insider trading.  To state a claim under Delaware law, Plaintiffs must allege that Defendants possessed material, non-public information and used that information improperly by making stock trades while motivated by the substance

29

United States District Court
For the Northern District of California

1   of such information.   <u>In re Oracle Derivative Litig.</u>, 867 A.2d 904,

2   934 (Del. Ch. 2004).   Similarly, California Corporations Code

3   Section 25402 makes it unlawful for officers or directors to sell

4   shares with knowledge of material non-public information.

5   Plaintiffs allege that the timing and amounts of Defendants' trades

6   give rise to an inference of insider trading.   However, the fact

7   that officers and directors sold shares during the IPO is far from

8   unusual or suspicious.   Further, the amounts sold were not

9   outrageously high enough to raise any suspicions.   Moreover,

10  Plaintiffs have not plead what inside information each Defendant

11  possessed, how and when that information was acquired and how that

12  information was used in trading Accuray stock.   For all of these

13  reasons, Plaintiffs' insider trading claims fail.[4]

CONCLUSION

15  For the foregoing reasons, the Court GRANTS Defendants' motion

16  to dismiss.   Docket No. 35.   The complaint is dismissed with leave

17  to amend, although the Court is doubtful that Plaintiffs will be

18  able to plead sufficient particularized facts to establish demand

19  ─────────────────

20  [4]Defendants argue that Plaintiffs' claim under California
    Corporations Code section 25402 is barred by the two-year statute
21  of limitations.   The operative complaint in this case was filed on
    April 8, 2010.   Defendants argue that Plaintiffs discovered facts
22  constituting the alleged violation on January 30, 2008, when
    Accuray issued a press release which announced a reduction in their
    revenue projection from $250-270 million to $210-230 million.
23  Comp. ¶ 105.   In the complaint, Plaintiffs discuss this press
    release under the heading, "The Truth Comes to Light: The Write-
24  Downs Begin."   Plaintiffs argue that they did not learn of the
    violation until January 29, 2009, when Accuray's new CFO admitted
25  the "imprecision" of the revised backlog definition.   Comp. ¶ 118.
    Plaintiffs' allegations suffice to bring their § 25402 claim within
26  the statute of limitations.   Accordingly, the Court denies
    Defendants' motion to dismiss Plaintiffs' claim on statute of
27  limitations grounds.

28                                    30

futility in any amended complaint.   Any amended complaint shall be
filed no later than September 20, 2010.   Defendants shall respond
by October 7, 2010.   If Defendants file a motion to dismiss,
Plaintiffs shall file an opposition by October 21, 2010 and
Defendants shall file a reply by October 28, 2010.   The motion will
be heard on November 11, 2010 at 2:00 p.m.   If Defendants answer
the amended complaint and no motion to dismiss is filed, a case
management conference will be held on October 19, 2010 at 2:00 p.m.

        IT IS SO ORDERED.


Dated: 08/31/10
                                 _____
                                 CLAUDIA WILKEN
                                 United States District Judge

**United States District Court**
For the Northern District of California

31